## Glanton v. Renner.

March 25, 1941.

B. J. Bethurum for appellant.
Ben V. Smith & Son and Neely, Marshall & Greene for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant and appellee were married in the year 1920 and lived together as husband and wife for about five years at which time they separated while living in Chicago, Illinois. One child was born to their marriage. In 1926 appellee brought her action in the circuit court of Cook county, Illinois, for a divorce and custody of the child, which action resulted in a judgment of divorce and "The care, custody, control and education of the minor child of the parties hereto, namely Polly Glanton, aged 15 months." And the court further adjudged:

"It is further ordered, adjudged and decreed by the Court that the defendant be and he is hereby ordered to pay to said complainant for the support of said child the sum of $75.00 per month, commencing from date hereof and that the complainant for and on behalf of herself waives all right to any alimony for her individual support and maintenance."

It appears that after appellant and appellee were divorced they drifted apart to different sections of the country—appellant residing most of the time in the state of New York where he remarried in January, 1928, and appellee remarried in December, 1928, and has been residing in the city of Atlanta, state of Georgia, with her second husband whose name she now bears.

Appellant having failed to pay any part of the allowance adjudged by the Illinois court for the benefit of his and appellee's child, Polly Glanton, in January, 1938, appellee brought this action in the Pulaski circuit court based upon the judgment of the Illinois circuit court as authorized by law to sue upon foreign judgments, to recover of, or require appellant to pay to her for the benefit of their child, all sums and delinquent payments as set out and adjudged in the judgment of the Illinois court. Appellant was duly served with the summons but made no defense to the action and judgment by default was rendered against him for $75 a month from the date of the Illinois judgment with interest thereon from due date of each payment, aggregating the sum of $14,918.28, and further adjudged that appellee further recover of appellant the sum of $75 per month, commencing from the date of the judgment, for the future

maintenance, support and education of the child, Polly Glanton. Appellant likewise ignored the judgment of the Pulaski circuit court and failed to pay same or any part thereof, and in February, 1939, pursuant to notice, a rule was issued by the Pulaski circuit court for appellant to show cause if any he had, why he should not be punished for contempt of court for failing and refusing to obey the judgment and orders of the court. The case was carried on the docket from time to time until November, 1939, when appellant filed his response to the rule in which he set out various alleged reasons why he should not be held in contempt of court for his failure to pay the judgment.

Appellant alleged in his response in substance that he is wholly insolvent and has no income from any source; that he has no employment and because of injuries he sustained in an automobile accident in 1935 he is unable to hold any position of employment and is unable to even support himself. He further pleaded that appellee was guilty of laches in permitting the judgment of the Illinois court to lay dormant for these many years without making any effort to collect same, and she is now, therefore, estopped to proceed against him for the collection of same in the manner here attempted.

The court overruled a demurrer to the response and thereupon the allegations of same were controverted of record and the evidence taken in open court and at the conclusion of the evidence the court held the response insufficient and ordered that the rule against appellant be made absolute and that he be adjudged to be in contempt of court for failing to pay the judgment to appellee for the benefit of the said child, and further ordered that appellant be committed to the county jail of Pulaski county, Kentucky, until he has complied with said judgment and rule, to all of which the appellant excepted and has prosecuted this appeal only from the judgment and order holding him in contempt of court.

There being no appeal from the judgment rendered in the Pulaski circuit court in favor of appellee upon the judgment of the Illinois court, we are not called upon to pass upon the merits or demerits of that judgment.

This appeal involves only the contempt phase of the case which presents these questions: (1) Whether or not the judgment of a domestic court based solely upon the

judgment of a court of a foreign state carries with it the remedies and modes of procedure for enforcing payment that the court of the state had wherein the foreign judgment was rendered, including the power to punish for contempt for failing to pay an allowance or judgment for support of children (or alimony, both of which comes within the same category); (1-a) or, even though the remedies for collection of such judgment may not be mandatory or incumbent upon the domestic court by virtue of Article 4, Section 1, of the Constitution of the United States which requires each state to give full faith and credit to judgments of sister states, yet, may a local court of equity which renders judgment upon a judgment of a court of a foreign state, exercise the broad prerogatives of a court of equity by invoking all remedies available to the domestic court to enforce collection or payment of such judgments, as if rendered originally in such domestic court; (2) whether or not the evidence is sufficient to support appellant's response to the rule.

■ The record is silent as to whether or not under the law of the state of Illinois the courts of that state may enforce the payment of an allowance for support of children or alimony by contempt proceedings. However, with regard to the laws of sister states, the weight of authority appears to be to the effect that in the absence of a showing to the contrary, the law of a sister state will be presumed to be the same as the law of the local forum in respect to public policy. Am. Jur., vol. 20, Section 178 et seq., and cases cited in notes thereto. Since, in this jurisdiction and in all other states of the Union, so far as we are advised, courts of equity have the power and authority to enforce the payment of such judgments as are here involved by contempt proceedings and, under the authorities, supra, we presume that the law of the state of Illinois is in harmony with the laws of this state and the common law prevailing throughout the many states of the Union.

■ However, aside from the question of whether or not under the laws of the state of Illinois the courts of that state have the right to proceed by rule for contempt to enforce the collection of such judgments, there is an abundance of authority to the effect that the domestic or local court rendering judgment upon a judgment of a foreign state has the power and authority to

resort to the modes of procedure to enforce the payment of such judgments, as are prevailing in the local jurisdiction, as if the judgment had been originally rendered therein.

While the question here presented is a new one in this state with respect to the precise question of contempt proceedings, yet, the case of Lape v. Miller, 203 Ky. 742, 263 S. W. 22, 23, seems to be in point with the present case. In that case the parties were divorced in the state of Ohio and subsequently the wife moved to Kentucky and instituted her action in the Campbell circuit court against her ex-husband seeking to enforce the payment of a judgment for alimony recovered by her in the divorce action in the Ohio court. After citing and quoting from certain cases bearing upon the issues involved, it is said:

"And later in the opinion it is pointed out that the modes of procedure to enforce an alimony judgment, within the jurisdiction of the forum rendering it, are not required to be observed by the courts of a sister state when called upon to enforce the judgment therein under 'the full faith and credit clause' of the federal Constitution; but that the binding force of the judgment will be obligatory upon the courts of a sister state, provided the court rendering it had jurisdiction of the subject-matter and of the parties, and it may proceed to enforce the judgment by the modes of procedure prevailing in that (local) jurisdiction, * * *." (Our parenthesis.)

Since contempt proceedings is one of the modes of procedure by which such judgments may be collected in this jurisdiction, it appears that the language employed in the case, supra, includes contempt proceedings as well as any other mode of procedure prevailing in this jurisdiction, and this obtains regardless of whether or not the courts of the foreign state wherein the judgment was originally rendered was or is authorized to proceed by contempt proceedings to enforce payments of such judgments. This rule seems to be in harmony with the trend of the more recent cases in other states.

On the question of authority of the local or domestic courts to enforce their judgments by contempt proceedings when such judgment is based upon the judgment of a court of a foreign state, the authorities are

not in agreement. In the earlier line of cases as appears in the annotations in 97 A. L. R. 1197, the trend of authority seems to be to the effect that the judgment of a local court based upon the judgment of a court of a foreign state, come within the category of a judgment for debt only, and hence the equitable remedy of contempt proceedings is not available. A reference to those annotations is sufficient without enumerating the various cases cited therein, since any interested reader may consult those annotations for himself. However, there are two conflicting lines of cases set out in those annotations, one holding to the view indicated above and the other to the contrary; but, a later line of judicial decisions on the same question appears in 109 A. L. R., beginning on page 652, and on page 643 preceding the annotation, will be found the case of Cousineau v. Cousineau, 155 Or. 184, 63 P. (2d) 897, which reviews and discusses at length the question here involved. It appears from that case and the annotations following it, that the trend of the more recent opinions lean from the older line of cases annotated in 97 A. L. R., holding that the remedy by contempt proceedings is not available to the courts to enforce the payment of such judgments as are here involved. According to the trend of those authorities, as well as the domestic case of Lape v. Miller, supra, it appears that the weight of authority is to the effect that local or domestic courts of equity may enforce the payment of their judgment, although based upon the judgment of a court of a foreign state, by the same modes of procedure and in the same manner as are available to such local courts to enforce any other judgment of the local jurisdiction. Ostrander v. Ostrander, 190 Minn. 547, 252 N. W. 449; Bruton v. Tearle, 7 Cal. (2d) 48, 59 P. (2d) 953, 106 A. L. R. 580; German v. German, 122 Conn. 155, 188 A. 429, and cases cited in Ann. 109 A. L. R., pages 653 and 654.

It is pointed out in the Oregon case, supra, that a judgment of decree for alimony (which also applies to allowance for support of children) is entirely different from a judgment for money or property and because of the difference in the character of the obligations, alimony judgments may be enforced by more efficient and effective means than those given to the enforcement of judgments at law. It is pointed out in the opinion, supra, and other opinions cited in the annotations, that

judgments for alimony and support of children rest to some extent upon public policy in requiring a husband to support his wife and children, due to the sacred humane relationship and that they may not become public charges and derelicts and, because of such public policy or public interest in such matters, courts of equity are given extraordinary powers to enforce the collection of such judgments, which may not be available for the enforcement of judgments merely involving property rights or matters in which the public policy of the state is not interested. It also appears from the trend of later authorities that domestic or local courts of equity have these inherent powers mentioned above to enforce their judgments even though they are based solely upon the judgment of a court of a sister state, whether or not they are bound to do so under the full faith and credit clause of the Federal Constitution.

Upon careful examination and analysis of the two classes of conflicting authorities on the question involved, and the reasoning upon which they are based, we have reached the conclusion that the sounder rule and the one more consistent with a sound public policy and justice, is that a court of equity in this jurisdiction has all the remedies and modes of procedure to enforce payment of their judgments for alimony and support of children, even though based upon the judgment of a court of a sister state, the same as if they had been originally rendered in the local jurisdiction.

We now come to consideration of appellant's response and the sufficiency of the evidence relating thereto.

Appellant testified that he was involved in an automobile collision in the city of Philadelphia in May, 1935, and was severely injured. At the time he did not think he was injured severely and drove to Stanton, Virginia, and at that time he was unable to get out of his car. However, he drove on to Lexington, Virginia, and two boys helped him out of his car and took him to a hotel and he could not be moved for two or three days; he was attended by a doctor who had an X-ray made which showed a slight curvature; after remaining there for a few days he went to Burnside, Kentucky, "In a crippled condition." He further said that he had suffered several recurrences of the same trouble and that since then

he had been disabled from performing any sort of manual labor; that he was unable to lift anything, and could no longer play golf or in fact do anything at all and could not drive a car for any length of time. He further stated that during the past year while trying to do his work with the Veneer Company he had had several recurrences of his trouble, and would have to write in that he was "laid up again"; one of those recurrences occurred in Clifton Forge, Virginia, one in Philadelphia and two in Jamestown, New York; he said that he didn't dare to try to work because if he did he would have to suffer the consequences; that he had a position with the Burnside Veneer Company but was forced to give it up because of his physical condition, and had had no position since September, 1939.

Appellant further stated that his second wife obtained a judgment of divorce from him in the Fayette county, Kentucky, circuit court in 1938, and also judgment for alimony in the sum of twelve or thirteen thousand dollars which he had paid, or a large portion of it.

In regard to the efforts made by appellee to collect the judgment in question since it was rendered in 1926, he said that a few years ago he was served with a summons in New York, and sometime within the last year Ben Smith, attorney 'for appellee, got in touch with him regarding the matter and that was the only efforts he knew of her having made until the present action was filed. He later said, however, that he was called on the telephone by Ben Smith in 1936 in regard to making payments on the judgment but at that time he was in no condition to pay anything.

On cross-examination appellant was asked about his average income from 1928 to 1938, and he said some years he made nothing and at times he made as little as $60 or less per week and out of that he paid his living expenses; but during the "better times" he made about $75 per week, and during the time he was living with his second wife, and particularly in 1929, he made about $500 per week. He said that in February, 1939, he married his present or third wife and had her to support; that he had worked for the Burnside Veneer Company but he quit about the fourth of September, 1939. He was asked about commissions he had made in that present year and he said he hadn't made very much because he had to quit work. With further reference to the ali-

mony he paid to his second wife he said he paid $2,750 in cash and gave a note which was still unpaid, except $1,170.50. He said, however, that he got the money from his father or that his father sent checks. He said he had no record himself of what his father had given him the last five or six years but he had paid off about $9,000 of the alimony judgment for his second wife. He admitted that in August of that year (1939) his father gave him $1,800 with which he paid some bills and his income tax, the latter being $600. He was asked what amount he received from a trust that his father had created for him and he refused to give any answer except that "You will have to ask him about that." He was asked if he hadn't spent about $6,000 a year during the last three or four years and he admitted that he had, and further said: "I have had the children (second wife's children) to care for and my own expenses," and further said "I suppose I have engaged in some foolish things, luxuries." He was asked, "You have spent some on liquor? A. I am sorry to say that I have; and I have had some rather expensive luxuries—I believe you will agree that Virginia (second wife) was rather expensive." (Our parenthesis.) He was again asked about the trust that his father had created for him, and he said he received the income from certain stock at his father's discretion.

Dr. M. C. Spradlin was introduced as a witness for appellant and he testified that he had examined appellant on that day and found "* * * that he was in a highly nervous state—high pulse, rapid, 140 per minute; * * *" and he said appellant gave him a history of having received an injury four or five years ago and that he has some trouble, the exact nature of which he was unable to determine and which would require a bone specialist. He said he did not have the use of an X-ray machine. He also found appellant's blood pressure to be 155, which, he said, was about 25 points above the average for a man of his age, 39 years. He was asked whether in his opinion appellant was able to work or hold a position of responsibility and he said he probably could hold a position for a time, but in his opinion he would do so at his own peril. He further said that aside from the rapid pulse, his testimony was based entirely on the history that appellant gave him and subjective symptoms.

S. J. Glanton, father of appellant, testified that he terminated appellant's position with the Burnside Veneer Company in October, 1939, because of his physical condition; that appellant suffered recurrences of his injuries received in the automobile accident but apparently would be all right for a month or two at a time and had worked "spasmodically"; that he had no income except what he saw fit to give him.

Testifying concerning the trust he had created for his son, the appellant, he stated that in December, 1936, he, S. J. Glanton, had 187 shares of stock in the Veneer Company transferred to himself as trustee to his wife and a like number of shares to his three children, including appellant, and that the beneficiaries were to receive the dividends from that stock. He said he owned 748 shares of stock in the Veneer Company but that it was encumbered to the extent of $36,980 and the trust agreement provided that before any dividend be paid, each of those 187 shares was charged with $9,245. He was asked what dividend appellant received in 1936, and he said he received $2,805 but due to the encumbrances "he received none of that, the amount I gave was the dividend." He said there were other expenses paid out of that dividend but he mentioned none except $25 which was paid to certain attorneys; that he, appellant, received $3,206.60 in 1937.

"Q. What did he get in 1938? A. $3740.00—$1870—$3740.00—$9350.00. He didn't get all of that however, part of it went to his second wife.
"Q. What about 1939? A. Take half of it, $3740.00 went to his second wife, that left him $3740.00."

The witness filed with his evidence a copy of the trust agreement referred to, which instrument recites that S. J. Glanton owned 748 shares of common stock of Burnside Veneer Company which was encumbered by a lien amounting to $36,980, and further recites:

"I, Stoddard J. Glanton, * * * do hereby give, transfer and now deliver irrevocably unto Stoddard J. Glanton, (himself) as Trustee, upon the following trusts and purposes, to-wit;— * * *" (Our parenthesis.)

He then proceeded to divide the 748 shares of stock into

four equal parts of 187 shares each, and that one certificate for said amount shall be made to the said trustee for Elizabeth P. Glanton, his wife, Paul J. Glanton, the appellant, and two daughters, thus giving the appellant 187 shares, or one-fourth of the 748 shares. The instrument further provided that each of said shares (meaning each 187 shares) was encumbered to the extent of $9,246. The trust instrument provided that:

"The income derived from said stock shall be paid as earned directly to each of said beneficiaries so long as they live.

"Provided, However, that so much of the income therefrom as the Trustee may determine to be proper shall be used to pay the encumbrances against said interest together with interest thereon. * * *"

The trust instrument further provides that the beneficiaries shall pay all taxes accrued against the ownership of and income from said stock. The concluding paragraph reads: "Provided, Further, that at all times each and every one of the beneficiaries shall have the stock dividends or the proceeds thereof from this Trust."

Mrs. Renner, appellee, testified in regard to her financial condition and expenses of keeping the child, Polly Glanton. She said her present husband, Charles Renner, was a salesman at a salary of about $200 per month and had no other source of income; that Mr. Renner had been paying the expenses of maintaining, educating, and taking care of Polly; that her teeth and eyes required medical attention in addition to her clothing, food, upkeep, education, etc. She further said that she, the witness, had no money nor income or property of any kind, nor any expectancy. She was asked about allowing the judgment to "drag along" and having made no effort to collect it, and she said it had been in Mr. Smith's hands twice; that Mr. Glanton, appellant, was dodging all the while and that her father had detectives out trying to find him, and they had asked appellant's father to forward letters to him as far back as 1929. Ben D. Smith, attorney for appellee, testified concerning the efforts he had made in trying to locate appellant and collect the judgment, and it appears from his testimony that appellee, through him as her attor-

ney, had made reasonably diligent efforts to locate appellant and collect the judgment or payments thereon, but was unsuccessful in doing so.

In regard to the question of laches, even though the judgment or allowance in question was for alimony for the sole benefit of appellee, we do not think the evidence would be sufficient to sustain that contention, since it is shown by the testimony of appellee, Mr. Smith, her attorney, and even that of appellant, that appellee was constantly endeavoring to locate appellant in an effort to collect the judgment. However, be that as it may, it must not be forgotten that the judgment of the Illinois court was for the sole benefit of the infant child, Polly Glanton, and it is specifically stated in the judgment that appellee waived all right to any alimony for her individual support and maintenance. Since the judgment was for the sole benefit of the infant child, who is the real party in interest, it certainly cannot be said that the infant child was guilty of laches, or that the laches of the mother could be attributed to the child.

As to appellant's physical condition, it may be conceded that the preponderance of the evidence tends to show that he is disabled from performing any substantial manual labor. However, it is shown that from the time of his injury in 1935 up to October, 1939, just before the contempt proceeding was tried, appellant did work more or less and received a salary in addition to lucrative stock dividends totaling several thousand dollars per year.

The trust created for appellant by his father sets apart 187 shares of stock in the Burnside Veneer Company for the benefit of appellant. Clause two of the instrument, as we have already indicated, provides that the income derived from the stock shall be paid directly to the beneficiaries as long as they live. But, this clause is modified with the proviso that the income shall be used by the trustee to pay encumbrances against the stock, if the trustee "may determine" such to be proper; and, the concluding paragraph quoted above, further provides that each and every one of the beneficiaries shall have the stock dividends or the proceeds thereof resulting from the trust. It would appear, therefore, that clause two and the final clause are more or less in conflict, since the former provides that the trustee

*may* use the dividends to pay encumbrances against the stock, and the latter provides that the beneficiaries *shall have the dividends* or the proceeds thereof, without any reference to the encumbrances. Hence, we look to the conduct of the parties, particularly S. J. Glanton, the creator of the trust, to ascertain the construction he placed upon it. It is apparent throughout the evidence of S. J. Glanton that he had paid the dividends and earnings of the stock to appellant amounting to several thousand dollars per year in addition to the several thousand dollars he paid to appellant's second wife in satisfaction of her judgment for alimony. It does not appear that he paid this as a matter of charity, or mere discretion, but apparently he recognized that the income from the stock set apart in the trust instrument for the benefit of appellant was really the money of appellant and for that reason he paid this obligation for appellant with latter's own money.

In Honaker v. Honaker, 267 Ky. 129, 10 S. W. (2d) 679, it is held that failure of the husband to comply with alimony decree is prima facie evidence of contempt, and the burden rests upon the divorced husband to show inability to pay, and if it appears that the husband is in fault, or has voluntarily created his inability to pay and, if the husband has impoverished himself by remarrying, he will not be excused because of his inability to pay. See, also, Fjeld v. Fjeld, 201 Minn. 512, 277 N. W. 203.

It is apparent from appellant's own testimony, as well as that of his father, that if appellant is financially unable to pay the judgment in question, he brought about his own impoverishment by remarrying which resulted in payment of alimony to the second wife in the sum of many thousands of dollars and by extravagant living and expenditures admitted by him in his testimony.

We conclude, therefore, that the evidence is sufficient to sustain the chancellor's finding that appellant has failed to establish or show any legal excuse for failing to comply with the judgment of the court.

It follows from what has been said, that the court acted within a reasonable discretion in holding appellant in contempt for his failure to pay the judgment, to the extent only, however, of the accrued payments adjudged by the Illinois court. But as to future payments, it ap-

pears that the authorities, supra, both domestic and foreign, are in agreement that a judgment of a local court based upon the judgment of a sister state for alimony or support of children payable in installments, can go no further than to adjudge a recovery of the accrued payments, since such judgments, especially future installments, are subject to modification by the court of the jurisdiction rendering it and perhaps any court which may acquire jurisdiction of the matter. Since there is no appeal from the judgment of the Pulaski circuit court adjudging appellee a recovery of future payments, we do not mean to hold that she cannot collect from appellant such future payments by means other than contempt proceedings, and our determination as to that item goes no further than to hold that the Pulaski circuit court should not hold appellant in contempt for failing to make such payments.

Judgment affirmed; whole court sitting.